There being no reversible error pointed out the judgment will be affirmed.

---

## FT. WORTH & D. C. RY. CO. v. WININGER.

(Court of Civil Appeals of Texas. Amarillo. 1911. On Motion for Rehearing, Dec. 1, 1911.)[1]

1. RAILROADS (§ 398*) — INJURIES TO LICENSEES—ACTIONS—SUFFICIENCY OF EVIDENCE.

In an action against a railroad company for injuries to a child in crossing defendant's yards in company with her father, evidence *held* to show that the father knew that the train which struck the girl was moving continuously from the time he went into the yards until the injury, and that the trainmen, being aware of such knowledge, properly acted on the assumption that he would protect the child against injury.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 398.*]

2. NEGLIGENCE (§ 89*)—CONTRIBUTORY NEGLIGENCE—PRESUMPTIONS.

Train employés who knew that a child five years of age was accompanied by her father in going through the yards, could assume, without being negligent, that the father would not per-

[1] Filed in the Court of Civil Appeals for the Second District at Ft. Worth, Jan. 18, 1911, and transferred to this court by order of the Supreme Court July 1, 1911.

mit the child to perform any act which would be negligent if done by him, at least until the contrary appeared, and were not themselves bound to take charge of the child for its protection.

[Ed. Note.—For other cases, see Negligence, Dec. Dig. § 89.*]

3. RAILROADS (§ 358*) — INJURIES TO LICENSEES—CARE REQUIRED.

One using railroad yards according to the *custom of the public to use them as a way, was* at most a licensee, and the company was not liable for injuries resulting merely from the dangerous condition of the yards.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1236–1237; Dec. Dig. § 358.*]

4. RAILROADS (§ 372*) — INJURIES TO LICENSEES—NEGLIGENCE—SPEED OF TRAIN.

Negligence in the speed of a freight train when a licensee was injured in railroad yards cannot be claimed, if, considering the weight and power of the engine, it could not have properly made the coupling had it been running at a less speed.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 372.*]

5. RAILROADS (§ 378*) — INJURIES TO LICENSEES—NEGLIGENCE.

Plaintiff, a girl five years and eight months of age, was, with her father, crossing through defendant's railroad yards, and was struck when she and her father, after walking between tracks, turned and crossed track No. 2, which the train *employés could not have learned that they in-tended to do, without having inquired of the father as they passed him shortly before that time, nor could they have anticipated any danger to plaintiff until she and her father sudden-ly turned to cross track No. 2, and then could not have avoided injuring them. Held, that* no negligence of the train employés, contribut-*ing to plaintiff's injuries, was shown.*

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1281, 1282; Dec. Dig. § 378.*]

On Motion for Rehearing.

6. RAILROADS (§ 389*) — INJURIES TO LICENSEES—NEGLIGENCE—PROXIMATE CAUSE.

Any negligence by train employés in failing to look out for plaintiff while she was in the yards, and in not ringing the bell, could not have been the proximate cause of her injury by being struck by a train; it appearing that plaintiff knew that the train was in motion, and that it was impossible for the employés to have prevented the injury after plaintiff started across the track even if they had been looking at her.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1319–1323; Dec. Dig. § 389.*]

Appeal from District Court, Donley County; J. N. Browning, Judge.

Action by Halys Wininger, by her next friend, E. H. Wininger, against the Ft. Worth & Denver City Railway Company. From a judgment for plaintiff, defendant appeals. Reversed and rendered.

Spoonts, Thompson & Barwise, H. B. White, and Turner & Wharton, for appellant. A. T. Cole and Odell & Johnson, for appellee.

GRAHAM, C. J.   This appeal is from a judgment based on the verdict of a jury, rendered in the district court of Donley county on November 3, 1910, awarding damages for injuries sustained by Halys Wininger as a result of her right foot and leg being run over and crushed by one of appellant's freight trains in its yards in the city of Clarendon, in Donley county, Tex., on Sunday morning about April 20, 1909; the injury resulting in the leg being amputated about three or four inches below the knee.  As appellant's road does not run through Clarendon either north and south or east and west, but in a north-west and southeast direction, some confusion is presented in the record, both in the pleadings and the evidence, and to avoid such confusion in this opinion, we shall treat appellant's road as running east and west through said city.  As a basis for the disposition we make of this appeal, we find that the record sustains the following material facts, to wit:

That for more than ten years before the occurrence out of which this suit grew, and at the time thereof, the city of Clarendon had been and was laid off and located with its churches, schoolhouses, business houses, and most of its residences, on the south side of appellant's tracks and right of way, and with its hotels and a small portion of its residences on the north side thereof.  That the company had its yards and switch tracks, including the Y in the southeast portion of said city, through which its main line also ran; the yards being in length about 3,000 feet east and west and about 400 feet north and south, except that about 700 feet from the east end they are about 600 feet wide for about 500 feet, the Y being constructed on this wide portion and on the north side of all the other tracks.  Lengthwise through these yards appellant had three switch tracks, parallel with the main line on the north side thereof, numbered 1, 2, and 3, in the order mentioned, from the main line north, and one switch track on the south side of the main line, all extending from within about 400 feet of its yard limits on the east to within about 400 feet of its yard limits on the west, except that the one on the south side of the main line passed on out of the yards at the west end and extended to appellant's passenger and freight depot, which is some three blocks on its main line and west of its yard limits; slightly nearer the east than the west end of these yards and between the main line and the switch track south thereof was appellant's water tank, and to the east of the water tank and beginning about 100 or 150 feet of it were its coal chutes, also being between the main line and the south switch track.

The company's said yards were inclosed by a post and wire fence and had been for many years, but the fence was not in good repair at the time of the injury, and had not been for some time prior thereto, there being plac-es where the wire was loose from the posts, and in one or two places the top wires had

been tied together so as to allow easy passage of pedestrians through the fence, and those who had occasion so to do, when it suited their convenience, had been for many years going through and over said fence and across said yards and tracks to such an extent as to make reasonably well-beaten paths along and across said yards, and which existed at the time of the occurence. Children living in the same vicinity with appellee on the north side of the tracks had been habitually going and coming across said yards in attending school on the south side thereof, though no streets or public roads had ever been opened up on any part of the yards. The portions of the city north and south of the yards are located on separate and distinct additions, and the streets and alleys running north and south on both the south and north sides of the yards stop at the yard limits. Garnet street is the first open street east of the yards connecting the north and south sides of the city, and it was generally used by persons in the northeast and southeast portions of the city in passing from north to south over the line of railroad. Gentry street was the first open one on the west of the yards, the next one being Gorst street, which was also open, and the next one west of it was Kearney street, which ran just east of appellant's passenger and freight depot, and being the one usually traveled by those in either the northwest or southwest portion of the city in going to the depot. Appellee resided with her father in the southeast corner of block No. 238, the east boundary line of which forms the west boundary of Garnet street, and it is the second block north from the company's yards, his residence being about 500 or 600 feet a little west of north from where the company's main line crosses Garnet street; the church to which appellee and her father had started when she received her injuries was situated in the northeast corner of block No. 42, being the fourth block and about 700 or 800 feet south of the company's main line, and between Gorst and Kearney streets. It is thus seen that appellee resided northeast of the company's yards, and the church to which she was going was southwest thereof.

On Sunday morning, about 9 o'clock, about April 20, 1909, appellee, in company with her father, left their home to go to church, intending to cross the railroad on Garnet street, but as they came out of their residence they saw that an engine and train attached headed east was standing across Garnet street, so they took one of the trails or paths mentioned, leading in a southwest direction, and followed it until after they got into the company's yards, passing on to the yards about 1,000 feet east of the water tank, and reached switch track No. 3 at about 950 feet east of the water tank; but as there was a string of cars on track No. 3, they continued in a west course on the north side of the track until getting within about 500 or 600 feet of the water tank. They came to the caboose which had been cut loose from the train, and here they crossed track No. 3 east of the caboose so as to be between it and track No. 2, and continued their journey west. About the time they were passing the caboose they passed also the conductor, who was on the ground between tracks Nos. 2 and 3 and near the west end of the caboose, he seeing them and they him; there then being a string of cars on track No. 2, they continued their journey west between tracks 2 and 3 to a point slightly east of the water tank, when they tried to cross track No. 2, either by going between cars and which were separated a space of six to eight feet, or by going under a car on track 2 (appellee's father claims there was a space as above indicated, and that they tried to pass over the track between the cars, while there are circumstances tending to show that there was no opening and that they tried to go under a car), and in attempting to cross track No. 2 at this point appellee received her injury by a car which was moving west on track No. 2, the father at the time, according to his evidence, being from one to two steps ahead of her. At the time they passed the conductor and brakeman, as hereinafter mentioned, the father was slightly ahead of the child. While appellee and her father were going west between tracks 2 and 3, after they had passed the conductor, they saw the rear brakeman on top of the train then on track No. 2 and he saw them, and they passed on by. No switch engine or crew was kept at these yards so that the different freight crews did such switching as was required, and there were usually a number of empties standing on the switch tracks on the yards.

On the morning in question a long freight train, going east, came into the yards and stopped to do some switching in order to change the position in the train of a car that had a defective drawhead, the same being near the middle of the train and the purpose being to put it next to the caboose in the rear of the train; the train came in on track 3 and was cut so as to take the bad order car out and set the portion of the train to which it was then attached at the rear on track No. 2, thus placing the bad order car on the west end; the engine then came back and got the remainder of the train except the caboose and went with it also to track No. 2, in this way getting the bad order car in the rear of the entire train; in going from track 3 to track 2 the entire train had to pass east onto the main line and then back in on track No. 2. There was at the time this train came into the yards a long string of empty box cars standing on track No. 2, extending from about 15 to 20 cars east of the water tank to 20 or 25 cars west of it; this string of cars being uncoupled in two or three places, leaving a

short space between where uncoupled. As the crew were backing in on track No. 2 the second time to pick up the first division of their train left there, while moving from two to six miles per hour, they backed against it, causing it to move the string of cars west and on the same track, and appellee was injured about 15 cars west of where the crippled car was, and by one of the cars which was on the track when the freight train pulled into the yards, and one not belonging to the train being handled by the crew.

At the time the injury was inflicted, the east end of the train was pointing south of east and the west end of it south of west, so as to place, the most northerly portion of the train about the middle thereof and about opposite where the caboose stood, making a curve in the south side of the train. The injury occurred about 67 car lengths from the engine, the engineer and fireman being in such position, because of the curve in the train, it was impossible for them to have seen either appellee or her father while on the north side of track No. 2. The conductor, at the time of the injury, was about 31 to 35 car lengths from the engine, and was on the north side and could have seen appellee and her father at all times after they passed him, until they passed behind or under a car on track No. 2, had he been watching, but he had not seen them after they passed him, as he had been engaged in directing the movements of his crew in handling his train, all of them being in the opposite direction or east of him. The rear brakeman, as well as the head brakeman, were on the south side of the train, giving to the engineer signals for the movement of the train; the head brakeman being about the switch stand, which was on the south side of the main line and about 15 or 20 cars west of the engine, while the rear brakeman was nearly south of the conductor and about opposite the point where the back end of the portion of the train then being moved, would couple on to the portion that had formerly been set on track No. 2, evidently for the purpose of making the coupling.

The train and crew were under the control and direction of the conductor, the crew consisting of the conductor, the rear and head brakeman, and the fireman and engineer. Neither of the crew, except the conductor and rear brakeman, as hereinbefore mentioned, knew that appellee or her father were on the right of way or had been, and the rear brakeman and conductor did not know they were on the yard at the time of the injury until after it occurred, it having been from four to six minutes since either the rear brakeman or the conductor had seen them, and that being when they passed them respectively as hereinbefore mentioned. The conductor and brakeman, at the time they saw appellee and her father going west, supposed that they were going off of the yards at the west end, and further than this they had no knowledge of where appellee and her father were going, in what direction they desired to go, if other than west, or where they had come from, though the evidence shows that appellee and her father were nicely and cleanly dressed. At the time of the injury, Halys Wininger was five years and eight months old; was a reasonably well-developed child for her age; was fair of form and an average as to looks and mental development; had always been healthy and cheerful, though she had never gone to school as her parents thought her not sufficiently developed mentally to attend. Halys did not testify on the trial, though she was placed upon the witness stand, and her injured limb exhibited to the jury, they thus having on opportunity of judging her capacities, including her discretion. The conductor in charge of the crew had worked only a short time for the company over this portion of its tracks, and claimed that he had no notice that the yards and grounds of the company therein were used or had been used by persons other than employés of the company, and, while the other members of the crew had worked over this portion of the track longer, they also disclaimed a knowledge that the company's yards and grounds were used by pedestrians or persons other than employés. The freight train in question came into the switch yards in Clarendon on the occasion of the injury, about 9 o'clock a. m., and from its arrival in the yards until the injury the crew were continually engaged in doing the switching above mentioned; it being clear from the evidence that the cars which were on track 3 when appellee and her father reached it was the remnant of the train being switched, which was left there while taking the first section to track 2, and at the time appellee and her father saw the rear brakeman on the cars on track 2 after passing the caboose, he was evidently on the first section of the train which had been moved from track 3 to track 2. The members of the train crew claimed that the engine bell was continuously ringing while the switching was being done and at the time of the injury, while appellee's father claimed that no whistle was blown or bell rung at any time after he and his daughter came on the yards. The evidence shows that appellee had suffered physical and mental pain since her injury and to the time of the trial, and would likely continue to so suffer for the remainder of her life; it also shows her ability to earn money from the time she reaches her majority to the end of her life has been depreciated as a direct result of her injuries. The space between the south rail on track 3 and the north rail on track 2, at the place where the injury occurred, and for several hundred feet east thereof, was about eight or nine feet, and the distance between the ends of the ties under track 3 and those under track 2, at the place where the injury occurred, as well as for

several hundred feet east thereof, was about four or five feet. The space between tracks 2 and 3 was ample for appellee and her father to have walked together in safety, even with a train moving on both of said tracks at the same time.

The evidence fails to show any stop or delay of any kind by appellee or her father at the place of the injury before starting across track 2, between the cars or under one of them, and the evidence shows they were walking at an ordinary gait, and while appellee's father's evidence shows most clearly that he was on his way to church with his child as above stated, there was no fact proven on the trial tending to put appellant's employés on notice that appellee or her father would likely desire or attempt to go across track No. 2 or south thereof, and the evidence when taken as a whole shows that if appellant's conductor, and in fact all of the employés operating said train, had been looking at appellee and her father when he and appellee started across track No. 2, either between the cars or under one of them, it would have been impossible, with the means at hand, to have stopped the car which ran over appellee and injured her before the injury occurred, and after they so started across said track.

[1] From the fact that the switching was continuous from the time appellee and her father came on the yards until the injury, we find that the father knew of this fact, and that the conductor and brakeman who had seen them so knew.

Under appellant's first assignment, complaint is made that the court erred in failing to give its first special charge, as follows: "You are charged that the evidence in this case fails to disclose any legal liability upon the part of defendant, and it therefore becomes the duty of the court to instruct you peremptorily that, under the law and the evidence, you cannot find for plaintiff, and it is therefore your duty to let your verdict be for the defendant, the form of which will be: 'We, the jury, find for the defendant.'"

We are of the opinion that the evidence, taken as a whole, fails to show such negligence as is alleged in the petition, on the part of appellant or its employés, proximately causing the injury complained of, and that therefore the requested charge should have been given, and that for failure to give same this cause should be reversed; and as the case appears to have been fully developed on the trial below, judgment should be rendered for appellant; and we think the facts hereinbefore found, together with the necessary deductions to be drawn therefrom, sustain said conclusion.

[2] Within the knowledge of the conductor, under whose direction and control the other members of the crew were acting, as well as the knowledge of the rear brakeman, (they being the only ones of the crew who knew that appellee and her father had ever been on the yards), appellee was in the company of, and under the direct and immediate control and management of, her father, on whom the employés had a right to rely to insure her doing no act that would amount to negligence, if committed by the father himself. In other words, the employés, under the circumstances, had a right to rely and act on the presumption that appellee, though herself of such tender years as to be wanting in discretion, would not be permitted by her father to perform an act of indiscretion that would amount to negligence if performed by the father.

[3] At best, Halys was a mere licensee on the yards of the company, and as stated in the case of Blossom Oil & Cotton Co. v. Poteet (Sup.) 136 S. W. 432, could not recover merely because of the condition of the yards or the location of the string of cars thereon.

The law imposes on the father the duty to protect his child, and the employés operating the train had a right to rely upon his performing this duty, at least until it appeared to them that he would not do so, and to so rely cannot be held negligence; and if it be said that when he started to lead his child between the cars or under them, it was the duty of the employés to then know he would not perform his duty, we answer that from the evidence in the record the conclusion is irresistibly forced that in the very nature of handling the train the employés then handling it, in the performance of their duties, could not have avoided the injury, as the signal to back the train had unquestionably been given by the conductor to the engineer at a time when no danger was apparent, and when danger did appear as a result of appellee and her father attempting to go between the cars or under one of them, no act on the part of the conductor, who was the only one of the employés who could have then seen appellee or her father, could have resulted in avoiding the injury, as the evidence shows beyond doubt that, before he could have given the engineer a stop signal and it had been obeyed by the engineer, the injury had been inflicted, as the father's evidence shows that the space between the cars where they tried to cross was only about six or eight feet, and the other evidence shows that at the time the injury was inflicted the train was moving from two to seven miles per hour.

[4] We think it cannot be successfully contended that there was any negligence in the speed at which the train was moving at the time of the injury, as it is made to appear from the evidence that, taking into consideration the length and weight of the train being moved, and the power of the engine, it could not have been kept moving at a less speed than it was, and successfully make the coupling that was to be made; hence if negligence at all, it must be in having moved the train, or in failing to stop before the

injury was inflicted, and after it became apparent that the father would not perform his legal duty by keeping his child out of danger, but would lead her into it by suddenly attempting to cross the track, either between the cars or under one of them. It must be borne in mind that appellee was at no time seen in danger by any employé of the company, and in fact she was in no danger until she attempted to follow her father in crossing the track.

The facts in this case on the issue of liability, it is believed, can be no stronger in favor of appellee than the case supposed by Justice Ramsey in the Poteet Case, above referred to, wherein he uses this language: "If we could assume that the managing officer of plaintiff in error had seen the child in the mill with her father at the time in a place of safety as she was, could it not be assumed, and ought it not to be held, that the company might rely on the natural affection common to all humanity—an affection which money cannot buy nor time wither—as to dangers known to the father to take proper and effective steps to secure such child from injury? In order to hold the oil mill liable there must be evidence of negligence, and that its conduct in the circumstances appearing in the case was violative of some duty which the law imposed on it. So situated, might it not trust to the protection which both law and duty would assure? The duty to protect the child in the possession and under the immediate control of both father and mother is both legal and moral and is continuing and affirmative, and, at least until it is known they have abandoned the child and its danger becomes apparent, the master is not liable."

The Poteet Case was one in which an infant was injured by coming in contact with machinery in the mill in which her father was an employé, the child having gone to and into the mill with her mother, who carried to the father his noon meal; the injury having occurred after both the father and mother knew the child was in the mill and the machinery in operation. In the Poteet Case a judgment was rendered for plaintiff in the trial court, which was also affirmed by the Court of Civil Appeals (127 S. W. 240) but the Supreme Court reversed the case and rendered the judgment for the oil mill on the ground that no culpable negligence was shown.

In the Nesbit Case, 43 Tex. Civ. App. 630, 97 S. W. 825, cited by appellee in her brief, it will be observed that the child was, by itself, going parallel with the railroad track in a trot and in the same direction as the train was moving, and toward a public crossing, and while some 12 or 15 feet from the track, turned toward it on the crossing; the engineer being blind in one eye, and the fireman so deaf he could not hear warning cries of bystanders, all of whom apparently saw the danger before the injury, and in time for the employés to have avoided it if a proper lookout had been maintained. The recovery was unquestionably permitted to stand in part because of the negligence of the company in having in its employ an engineer and fireman so defective in their senses; and because these defects were the proximate cause of the injury, plaintiff in the pleadings having charged negligence on these grounds among others, as being the cause of the injury, the child was run over and injured on the crossing.

In the Vallejo Case, found in 102 Tex. at page 70, 113 S. W. at page 4, Justice Brown, speaking for the Supreme Court, held that the fact that employés of a railway company saw a child three years old, by itself, after dark walking on the main line of the railroad in the opposite direction from that the train was moving on a switch track, about 14 feet from the main line, would not render the company liable for running over the child a few minutes thereafter without actual knowledge of those operating the train that it had changed its position; and in disposing of the case he uses this language: "The question then arises, What should the employés of the railroad company have done under the circumstances to guard that little child against injury? It is manifest that there was nothing for them to do but what they did do—leave the child in its then secure condition and attend to their duties, or stop the train and send some one to carry the boy to its mother. Would any one contend that it was the duty of the railroad company to cease the operation of its train in order to perform duties of nurse? If there had been any probability that by the continued movement of the train the injury would be inflicted on the boy, the duty to stop the train would have arisen, but no such result was indicated by the facts."

[5] In view of the fact that we think the evidence conclusively shows that there was no fact or circumstance tending to put the operatives of the train on notice that the father would not perform his duty to his child, by protecting it from dangers patent to him, the employés were not guilty of any degree of negligence charged in the pleading in having failed to take charge of the child; and in view of the further fact that if all the employés had been watching appellee and her father, from the time they were first seen on the yards, they could not in the exercise of any degree of care, short of inquiry from the father, have learned that appellee and her father would likely attempt to turn south and cross track No. 2; and in view of the fact that without such knowledge the employés could by the exercise of no degree of care known to the law have anticipated any danger to either appellee or her father until they suddenly turned south to cross said track No. 2; and in view of the fact that the evidence shows conclusively that had all of the employés at the time they

started to cross the track seen them, nothing could have been done to avoid the injury—we think beyond doubt no such negligence as is alleged in appellee's pleadings can be held to have in any way been proximately the cause of the injury. The facts, showing as they do, that the injury was the direct and proximate result solely of the act of appellee and her father attempting to so suddenly cross track No. 2, as to allow no opportunity on the part of the employés with any or all means at hand to have then avoided the injury, they having been guilty of no negligence proximately causing appellee and her father to at that time attempt to cross the track, can certainly not be held to show liability, whether appellee be an infant or an adult.

In disposing of the case of Texas & Pacific Railway Company v. Shivers, 48 Tex. Civ. App. 112, 106 S. W. 894, which was a case where the evidence shows that Shivers, by his own voluntary act, went from a place of safety to a place of danger so suddenly as not to allow the operatives of the train to avoid injuring him, Justice Speer held that no recovery could be had; holding that no such lookout as could have been maintained by the employés could have prevented the injury; further holding that in such case the question of whether or not the employés had kept a proper lookout was not an issue in the case.

In view of the fact that the father in this case was within the knowledge of the employés with his child, and that they were in a place of safety when last seen by the employés, and that from the time they left the place of safety to the time of the injury nothing could have been done by the employés to avoid the injury, they having been guilty of no negligence causing the act of going from a place of safety to a place of danger, under the reasoning in the Poteet, Vallejo, and Shivers Cases, above quoted from, we find no evidence in the record in this case tending to show negligence on the part of the company of which appellee can complain.

Believing that the evidence is insufficient to show negligence on the part of the defendant in any particular charged in the petition, it follows that the trial court erred in failing to give special charge No. 1 requested by appellant, and as the case appears to have been fully developed on the trial below and no good purpose could be served by remanding the same for another trial, it will be reversed and here rendered for appellant, and it is so ordered.

### On Motion for Rehearing.

Appellee, in her motion for rehearing, among other things, complains that this court, in its former opinion, used this language: "The members of the train crew claim that the engine bell was continually ringing, while switching was being done, and at the time of the injury."

[6] While this statement was made in the original opinion only as a means of calling attention to the fact that there was an issue of fact raised by the evidence introduced by appellant and appellee on the question of whether or not the bell was being rung, and we think the statement cannot possibly do appellee any injury, we will withdraw that statement, and here state succinctly the facts as shown by the evidence on that issue as follows: The father of appellee testified in substance that the bell was not ringing either when the accident occurred or at any time while he and his daughter were on the yards, while the fireman testified, in substance, that the bell was ringing not only when the accident occurred, but during the entire time the switching was in progress. No other witness testified on this issue, though a sworn statement formerly made by the engineer to the same effect as the fireman's evidence is found in the record.

Our former opinion is in no way or particular based on any supposed negligence of Halys Wininger, or of her father, but is based on the proposition that as we view the record in its entirety, the evidence fails to raise an issue of negligence on the part of the company or its employés, in any particular charged in appellee's pleadings, that could have caused the injury complained of.

If it were admitted that the employés were guilty of negligence, both in failing to keep an eye on appellee and her father at all times while they were on the yard, and in failing to continually ring the bell, in the light of the other evidence found in the record, we think, neither of said acts can be held to in any way have had any thing to do with the injury complained of, for the reasons that the record, without controversy, shows that the train was continually in motion during all the time appellee and her father were on the yards, and that appellee and her father knew this fact, and ringing the bell could have served no purpose except to inform appellee and her father of the fact that the train was in motion, or was about to be put in motion; and we also think the record conclusively shows that had every employé been looking at appellee and her father, immediately before and at the time they started to cross the track, where appellee was injured, because of the suddenness of their turning and attempting to cross said track, it was impossible for appellant to have done anything to avoid said injury.

In deference to the earnestness and ability with which appellee's counsel has urged a rehearing in this case, we have again carefully gone over the record, but finding no merit in the motion, except as indicated herein, the motion will be overruled, and it is so ordered.